**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | |
|---|---|
| **ELENA HARGETT,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case number 1:06cv0035 ERW** |
| ) | **TCM** |
| **JO ANNE B. BARNHART,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying Elena

Hargett disability insurance benefits ("DIB") under Title II of the Social Security Act ("the

Act"), 42 U.S.C. §§ 401-433, and supplemental security income benefits ("SSI") under Title

XVI of the Act, 42 U.S.C. §§ 1381-1383b. Plaintiff has filed a brief in support of her

complaint; the Commissioner has filed a brief in support of her answer. The case was referred

to the undersigned United States Magistrate Judge for a review and recommended disposition

pursuant to 28 U.S.C. § 636(b).

**Procedural History**

Elena Hargett ("Plaintiff") applied for DIB and SSI in April 2004,[1] alleging she was

disabled as a result of asthma, allergies, arthritis in her right knee, and problems in her left

---

[1]Plaintiff had previously applied for DIB. (Record at 147.) This application was denied on
February 1, 2004. (Id.)

foot, right wrist, and right shoulder. (R. at 61-63, 109-11.)[2] In her SSI application, she alleged the disability began on January 5, 2001; in her DIB application, she alleged the disability began on December 1, 2003. (Id. at 61, 109.) Her applications were denied initially and after a hearing held in July 2005 before Administrative Law Judge ("ALJ") Craig Ellis. (Id. at 14-18, 21-44, 53-58, 73-75, 88-92.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 5-7.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified that she born on March 16, 1948, and was then 53 years' old. (Id. at 26.) She lived with her husband and two daughters, one was 15 years' old and the other was 13. (Id.) Her husband worked at a factory. (Id. at 27.) She completed the eighth grade, and did not have a General Equivalency Degree ("GED"). (Id.) She could read, write, and do simple arithmetic. (Id. at 28.) She was right-handed, 4 feet 11 inches tall, and weighed 152 pounds. (Id.)

All the family income was from her husband. (Id. at 29.) That income was approximately $1,500 monthly. (Id.) The family had Missouri Medicaid. (Id. at 27.) They

---

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

also received food stamps, the amount of which varied according to whether her husband was laid off, which he periodically was. (Id. at 29-30.)

Plaintiff had worked as an office assistant at a retail department store. (Id. at 30.) She worked on the computer and did the orientation for new employees. (Id.) She could no longer perform that job because it required working with her hands and moving from one area to another. (Id. at 30-31.) Her asthma made it difficult for her to breathe. (Id. at 31, 39.)

She used a prescribed nebulizer three or four times a day. (Id. at 31.) She also used a hand inhaler. (Id.) Even so, she never felt like she had the breathing capacity to make it through the day. (Id. at 42.)

Plaintiff was wearing a splint on her right hand on the recommendation of her doctor's assistant. (Id. at 31-32.) The assistant had diagnosed Plaintiff with tendonitis and suggested that she refrain from using that hand as much as she did and that she use a splint everyday to try to control the swelling. (Id.)

Plaintiff further testified that her daughters did the laundry because it was too hard for her to do it. (Id. at 32.) They did a lot of the household chores. (Id. at 33.) Her oldest daughter had a driver's permit and drove Plaintiff to the grocery store. (Id. at 32.) Plaintiff's hands became numb when she held the steering wheel. (Id. at 32-33.) She also had problems seeing and was to get some glasses the next week. (Id. at 33.)

Plaintiff had recently seen Dr. Ritter about her right shoulder. (Id.) It was determined that she had arthritis. (Id. at 34.) She was to have an MRI the next week to see if there was any damage. (Id.) She also had had an injection in that shoulder. (Id.) The injection had

helped that day only, then the pain had returned. (<u>Id.</u>) Consequently, she was taking pain medication. (<u>Id.</u>) Another doctor was preparing a brace for her to wear on her right foot. (<u>Id. at 35-36.</u>) The brace was to help the ligaments. (<u>Id.</u> at 36.) She had had physical therapy for the foot. (<u>Id.</u> at 37.) The therapy had helped, and the brace was to help even more. (<u>Id.</u>) She had pain in both feet that came and went. (<u>Id.</u> at 36.) Additionally, Plaintiff had knee surgery in April 2003 followed by five or six injections. (<u>Id.</u> at 37.) Her knee was better, although she occasionally had sharp pains. (<u>Id.</u>)

Plaintiff did not think she could be on her feet for as long as half a workday. (<u>Id.</u> at 38.) At home, she hurt if she was on her feet for longer than fifteen minutes. (<u>Id.</u>) She did not have any problems sitting, but did have pain in her foot when she got up from a sitting position. (<u>Id.</u>) The problems with her knees, feet, and ankles would prevent her from doing the walking and standing required by her job as an office assistant. (<u>Id.</u> at 39.)

Plaintiff also had problems with her hands. (<u>Id.</u> at 40.) She had been told years ago that she had carpal tunnel syndrome. (<u>Id.</u>) She thought she would ask Dr. Ritter about it the next time she saw him. (<u>Id.</u>)

Plaintiff testified that she could not perform a job that required her to handle 20 pounds two or three hours a day. (<u>Id.</u> at 41.) Her asthma prevented her from bending over and picking up something and it bothered her to have to carry anything. (<u>Id.</u>)

Plaintiff read a lot during the day, but did not otherwise do "a whole lot of anything." (<u>Id.</u> at 33.) Although she had tried, she could not do dishes or fold clothes or other simple

chores.  (Id. at 42.)  She "r[an] out of air" just getting up in the morning, and had to take breaks when showering.  (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from various health care providers, and the report of a consultant.

When applying for DIB and SSI, Plaintiff reported that her impairments started bothering her in 1992 and prevented her from working on December 1, 2003.  (Id. at 151.)  She also reported that she stopped working on November 1, 2002, because of breathing problems.  (Id.)  She worked from 1993 to September 1999 in retail sales counting money and using an adding machine and a coin counting machine.  (Id. at 151-52.)  This job required that she use machines, technical knowledge, or skills and that she write or perform similar duties.  (Id. at 152.)  During the workday, she would walk for a total of one hour; handle, grab, or grasp big objects for one hour; reach for three hours; and write, type, or handle small objects for seven hours.  (Id.)  The heaviest weight she occasionally or frequently lifted was less than ten pounds.  (Id.)  She listed four doctors, two she had seen in 2004 and two she had seen only in 2003.  (Id. at 153.)

Plaintiff listed seven jobs on a Work History Report.  (Id. at 139.)  The job she held the longest was that of an office assistant in a retail business from October 1993 to November 1999.  (Id.)  On this report, she described that job as requiring one hour of walking each day, one hour of standing, six hours of sitting, and four hours of writing, typing, or handling small

objects.  (<u>Id.</u> at 143.)  The weight requirements were the same as previously reported.  (<u>Id.</u>)

In a separate questionnaire, Plaintiff listed three conditions that kept her from working: asthma and pain in her right foot and left knee.  (<u>Id.</u> at 130.)  The symptoms that kept her from working were shortness of breath and an inability to stand or walk for long because of the pain.  (<u>Id.</u>)  She used a nebulizer three times a day and a continuous positive airway pressure ("CPAP") machine every night.  (<u>Id.</u> at 131.)  Each nebulizer treatment took at least one hour. (<u>Id.</u> at 132.)  She did not do any household chores.  (<u>Id.</u>)  The only meal she prepared was a microwaved lunch when she was alone.  (<u>Id.</u>)  Her personal grooming had changed only to the extend that she ran out of breath and had to take baths instead of showers.  (<u>Id.</u>)  She drove to her doctor's office if it was in town, to her daughters' school, or to her brother's house two miles away.  (<u>Id.</u> at 133.)  She did not drive an unfamiliar route.  (<u>Id.</u>)  She had difficulty leaving her house when her allergies were bad, primarily in the spring, or when the arthritis in her knee made it hard for her to drive.  (<u>Id.</u>)  She did daily exercises for her arthritis.  (<u>Id.</u> at 135.)

Plaintiff's earnings records reflect steadily-increasing earnings between 1982 and 1987, inclusive, and between 1993 to 1998, inclusive.  (<u>Id.</u> at 68.)  Her annual income for 1999 was approximately one-third less than for 1998 and was even less in 2000.  (<u>Id.</u>)  Her income for 2001 and 2002 was minimal – $190.65 and $237.50, respectively.  (<u>Id.</u>)

Also before the ALJ was a form completed by the Social Security Administration counselor who telephonically interviewed Plaintiff when she applied for DIB and SSI.  (<u>Id.</u>

at 147-49.)  The interviewer noted that Plaintiff could hardly talk because she was coughing and out of breath.  (Id. at 148.)

The medical records before the ALJ are summarized below, in chronological order.

Plaintiff first consulted Hugh R. Protzel, D.P.M., with the Foot and Ankle Centers, on December 11, 2002.  (Id. at 223.)  She had had pain in her left heel for one year.  (Id.)  The pain was worse in the morning and after sitting down and getting up.  (Id.)  She also had pain in the ball of her right foot.  (Id.)  X-rays revealed mild infra calcaneal osteophyte in her left heel only.  (Id.)  The diagnosis was left heel plantar fasciitis and right foot metatarslagia.  (Id.)  Plaintiff was injected with Depro Medrol and Lidocaine in each foot, prescribed Celebrex, and told to return in two weeks.  (Id.)  On December 24, Plaintiff reported that she continued to have pain in both feet, although it was "quite a bit better."  (Id. at 222.)  She was given an injection of Dexamethasone and Lidocaine in each foot and was to return in four weeks.  (Id.)  As of Plaintiff's next visit, on January 15, 2003, she was no longer having any pain in her feet.  (Id. at 221.)  In response to her inquiry, she was told to discontinue the Celebrex.  (Id.)

Two days before that visit, Plaintiff consulted Rick Tate, M.D., with the Clopton Clinic in Jonesboro, Arkansas, about her asthma.  (Id. at 281-84.)  She had had problems with her asthma for the past week, and had been having problems finding an orthopedist to consult about her knee pain.  (Id. at 281.)  Dr. Tate added Zithromax and a z-pack of Prednisone to her previous medication of Albuterol.  (Id. at 283.)  One month later, Plaintiff returned to Dr. Tate with reports of her asthma being problematic on more days.  (Id. at 278-80.)  She had been short of breath and was coughing up yellow phlegm.  (Id. at 278.)  She denied any back

or joint pain, muscle cramps or weakness, and arthritis.  (Id.)  Her asthma was described as having deteriorated.  (Id. at 279.)  She was additionally prescribed Advair Diskus for her asthma and a dosepack of Medrol.  (Id.)  She was to return in two weeks.  (Id. at 280.)

Plaintiff did return, reporting that she had been coughing for the past three weeks, her chest had been feeling tight, and her upper back hurt.  (Id. at 275.)  She became short of breath on exertion.  (Id.)  Her asthma was described as unchanged; her respiratory infection as having deteriorated.  (Id. at 276.)  She was prescribed Phenergan with codeine for her cough.  (Id.)  A low sodium and low cholesterol diet and regular exercise were recommended.  (Id. at 277.)

At her check-up visit the following month, Plaintiff denied any dyspnea, or shortness of breath.  (Id. at 272.)  Her asthma and respiratory infection were each described as unchanged.  (Id. at 273.)  An additional condition of acute bronchitis was also described at one point as unchanged and at another as improved.  (Id. at 271, 273.)  No new medications were prescribed.  (Id. at 272.)  Plaintiff also wanted to know if Dr. Tate would give the okay for her to have knee surgery.  (Id. at 269.)  He did.  (Id. at 271.)

Plaintiff next returned to the Clopton Clinic on June 17.  (Id. at 265-68.)  She reported that her shortness of breath was becoming worse.  (Id. at 265.)  She also complained of vertigo and feeling light-headed and faint.  (Id.)  Pseudoephedrine was added to her medications, and two tests were ordered.  (Id. at 266, 267.)  One test, a spirometry to measure her pulmonary functioning, was normal.  (Id. at 264.)  The other, an echocardiogram, was normal with the exception of a 65 to 70% left ventricle ejection fraction, moderate left

ventricle hypertrophy, and mild tricuspid valve regurgitation.[3] (Id. at 262.) A computerized tomography ("CT") scan of her chest performed the following week was negative. (Id. at 257-58.)

Plaintiff returned to Dr. Tate on July 23. (Id. at 252-55.) She was using her inhalers, but her shortness of breath was getting worse. (Id. at 252.) She also complained of vertigo and wheezing. (Id.) She denied having any headaches or chest pains. (Id.) The pseudoephedrine was discontinued; a sleep study was to be scheduled. (Id. at 254.) The sleep study was conducted the next month and revealed severe sleep apnea and severe nocturnal myocolonus.[4] (Id. at 250-52.) Consequently, five days later, Plaintiff was fitted with a CPAP machined. (Id. at 248-49.)

When Plaintiff next saw Dr. Tate, in October, she reported that she was sleeping much better with the CPAP machine. (Id. at 244.) She had recently seen an orthopedist who had given her an injection in her right knee. (Id.) This had improved that pain, although there was still some swelling. (Id.) For the past week, however, she had been having trouble with shortness of breath and cold symptoms, including a congested head and nose and dry and scratchy throat. (Id.) She would wheeze when moving. (Id.) She also complained of fatigue

---

[3]The results also indicated "mild MR." It is not clear whether the "MR" refers to mitral reflux or to mitral regurgitation.

[4]Nocturnal myoclonus are "frequently repeated muscular jerks occurring at the moment of dropping off to sleep." Pharma-lexicon.com, mediLexicon, http://www.pharma-lexicon.com/medicaldictionary.php?t=58407 (last visited January 10, 2007).

and malaise.  (<u>Id.</u> at 245.)  A new medication to add to the CPAP and another medication for her cough were prescribed.  (<u>Id.</u> at 246.)

The following month, Plaintiff complained of increased congestion during the past few days, a productive cough in the mornings and a dry cough throughout the day, and chest tightness with wheezing.  (<u>Id.</u> at 240.)  She was using her inhaler during the day and the CPAP machine at night.  (<u>Id.</u>)  Avelox and Rhinocort, a nasal spray, were added to her medications.  (<u>Id.</u> at 242.)

Between her July and October visits, Dr. Tate referred Plaintiff to August R. Ritter, M.D., for an evaluation of her right knee and wrist pain.  (<u>Id.</u> at 288.)  She informed Dr. Ritter that she had had tendonitis in her right thumb that had previously been treated with injections. (<u>Id.</u>)  She further informed him that she had had a right knee arthroscopy in April 2003 with partial medial meniscectomy.  (<u>Id.</u>)  That arthroscopy had revealed medial compartment degenerative changes.  (<u>Id.</u>)  X-rays confirmed the medial compartment arthritis, but showed no problem with her wrist.  (<u>Id.</u>)  On examination, she had a good range of movement in her right knee, but had pain on palpation.  (<u>Id.</u>)  She was given a thumb splint to be used as needed, prescribed Vioxx, and given the first of five Supartz injections in her right knee.  (<u>Id.</u>) Five weeks later, on September 22, she had her last injection.  (<u>Id.</u> at 287.)  She reported that her knee was doing "quite well" and she was able to do her daily activities with minimal discomfort.  (<u>Id.</u>)  One month later, she continued to do as well and was described as having "[e]xcellent motion."  (<u>Id.</u> at 286.)  She was to return as needed.  (<u>Id.</u>)

Plaintiff consulted Timothy W. McPherson, D.O., on February 14, 2004, about a cough and sore throat.  (Id. at 227-30.)  It was noted that she had been regularly using a CPAP machine since September 2003.  (Id. at 230.)  It was also noted that her asthma was triggered by cat dander, and she had been exposed to second-hand cigarette smoke.  (Id.)  Dr. McPherson diagnosed Plaintiff with bronchitis and prescribed various medications for that and for her asthma.  (Id. at 228-29.)

Five days later, Plaintiff again consulted Dr. Tate.  (Id. at 234-39.)  She continued to have shortness of breath on exertion and, for the past week, had a runny nose, dry cough, sore throat, and headaches.  (Id. at 234.)  She had also been having bleeding an hour after a bowel movement.  (Id.)  A nebulizer machine and supplies were provided.  (Id. at 235.)  New asthma medications were prescribed.  (Id. at 237.)  A subsequent colonoscopy revealed no clear reason for the bleeding, but the physician concluded it was probably related to hemorrhoids. (Id. at 232-33.)

Plaintiff next saw Dr. Protzel on April 21.  (Id. at 218-19.)  She consulted him about a sudden onset of pain in her left heel.  (Id. at 218.)  An x-ray revealed no change since the previous one.  (Id.)  The diagnosis was plantar fasciitis; the treatment was an injection of Dexamethasone and Lidocaine, a prescription for Feldene, and a night heel splint.  (Id.)  Dr. Protzel anticipated a "fairly good recovery" over the next few weeks.  (Id.)  Plaintiff returned on May 12.  (Id. at 217.)  She reported that she had "much less pain and discomfort."  (Id.)  She continued to have problems being on her feet for any length of time; however, Dr. Protzel noted that she was wearing "inappropriate" shoes.  (Id.)  Plaintiff displayed "[l]ittle to no

pain" on palpation; her plantar fasciitis was described as resolved. (Id.) Plaintiff was to buy "some good shoes," wear them all the time, and return as needed. (Id.)

On May 4, Plaintiff returned to visit Dr. McPherson. (Id. at 209-10, 225-26.) He noted that her asthma had improved with the nebulizer and medications. (Id. at 209, 225.) She was to follow-up with her doctor in Jonesboro (presumably Dr. Tate) and to return to the clinic in three to six months or as needed. (Id. at 210, 226.)

On February 9, 2005, Plaintiff returned to Dr. Protzel with a complaint of pain and discomfort in her right ankle. (Id. at 190.) Her heel no longer hurt. (Id.) She showed no decrease in muscle strength or arch height and no osseous or degenerative changes. (Id.) The diagnosis was peroneal tendinitis. (Id.) Her ankle was injected with Dexamethsone and Lidocaine, and she was to return in a few weeks if her pain persisted. (Id.)

The next month, on March 9, Plaintiff consulted Edith Hickey, M.D., with the Kneibert Clinic in Poplar Bluff, Missouri, about her asthma. (Id. at 203-07.) She had had a nonproductive cough, wheezing, and runny nose for the past five days and an exacerbation of her asthma for the past two days. (Id. at 203.) She was 4 feet 11 inches tall and weighed 170 pounds. (Id.) A chest x-ray revealed findings consistent with asthma, but no infiltrates or hyperinflation. (Id. at 207.) Plaintiff was prescribed Tessalon Perles, Albuterol Sulfate for use in her nebulizer, Albuterol, Levaquin, Prednisone, and Advair Diskus to be inhaled twice a day. (Id. at 205.) She was to taper off the Prednisone and return in one week. (Id. at 204-05.) She did so, reporting that her asthma was "not much better." (Id. at 201.) Her cough was productive, but she was still running a low grade temperature of 99.3 degrees

Fahrenheit. (Id.) On examination, the air movement in her lungs was much better than the last week. (Id. at 202.) The medications were continued, with the exception of the Tessalon Perles, Prednisone, and Levaquin. (Id.) Pulmicort, to be used in her nebulizer, was added. (Id.) The following week, on March 24, Plaintiff reported that her asthma was better, although she had a little bit of a cough. (Id. at 194.) She was to continue with the Advair and Albuterol as needed. (Id.) Her prescription for Pulmicort was also renewed. (Id. at 195.) Plaintiff was to follow-up as needed. (Id.)

The following month, Plaintiff returned to Dr. Protzel, explaining that she had worn the ankle brace for three weeks and had been feeling better until the pain had returned. (Id. at 189.) She was prescribed Feldene and instructed to use the ankle brace. (Id.) If the pain continued, a permanent brace would be obtained. (Id.) On May 4, Plaintiff reported that she had continued pain in her right foot, although the temporary brace helped. (Id. at 179.) She was to participate in therapy for peroneal tendinitis, and a permanent brace was to be obtained. (Id.) On May 18, Plaintiff reported continued pain and discomfort. (Id. at 177.) She was to continue with the therapy. (Id.) The record reflects that Plaintiff was evaluated for physical therapy that same day. (Id. at 184-86.) She explained that she could not walk or stand too long and had had the pain for two years, unrelated to any trauma. (Id. at 184.) The first therapy session was on May 25. (Id. at 183.) The treatment included stretching, resistence exercises, and ice packs. (Id.) After the third session, on May 27, Plaintiff stated that she felt better and rated her pain as a zero on a ten-point scale, with ten being the worst. (Id.) She rated the pain the same after the next session three days later. (Id.) After the May

31 session, she described the pain as being "a lot better" and being a two.  (Id. at 182.)  She had therapy again on June 2, but canceled the next session.  (Id.)  On June 8, she complained of pain, rating it as an eight.  (Id.)  The following session, on June 10, she continued to complain of pain and denied feeling any relief.  (Id.)

Plaintiff reported to Dr. Protzel on June 22 that the therapy was not helping.  (Id. at 175.)  She forgot to take the Feldene.  (Id.)  The therapy was discontinued, and she was to return when her ankle brace was ready.  (Id.)  Plaintiff was fitted with her ankle brace on August 3 and was instructed to wear it full time with shoes and to return as needed.  (Id. at 173.)

Dr. Hickey also referred Plaintiff to Dr. Ritter.  (Id. at 159.)  Tammy Hahn-Brown, ANP (adult nurse practitioner), examined Plaintiff at her initial visit on July 14 for complaints of right shoulder and wrist pain.  (Id. at 159-60.)  Ms. Hahn-Brown noted that Plaintiff had been evaluated in the office before for the wrist pain, and the pain had been, until recently, less bothersome.  (Id. at 159.)  Plaintiff reported that her right shoulder had been hurting for the past few months.  (Id.)  Plaintiff could not attribute the increase in pain in either her shoulder or wrist to any injury, trauma, or other specific cause.  (Id.)  Plaintiff's medical history included asthma and lung disease; her previous hospitalizations included, in addition to childbirth, knee surgery in August 2003.  (Id.)  Her current medications included an Albuterol inhaler, as needed; Advair; Albuterol and Ipratopium in a neubilizer three times a day; and Tylenol arthritis.  (Id.)  Her recent problems included shortness of breath and headaches or migraines.  (Id.)  On examination, Plaintiff was able to demonstrate a good

range of movement in her right shoulder, although she was sore over her acromioclavicular joint on the right.  (Id.)  She denied any numbness or tingling in her right arm and hand, but did have a moderate amount of edema, or swelling, in her right wrist and slight discomfort on palpation in the wrist area.  (Id.)  She also had negative Finkelstein[5] and drop arm tests.  (Id.)  X-rays brought by Plaintiff of her right wrist and shoulder were within normal limits and were negative for any acute findings.  (Id.)  The diagnosis was right shoulder pain and right chronic wrist pain and edema.  (Id. at 160.)  Plaintiff was going to be prescribed a Medrol dose pack and was to limit any excessive repetitive use of either her right wrist or shoulder for a few days.  (Id.)  A magnetic resonance imaging ("MRI") of her right wrist was to be taken the next day to eliminate any internal problem.  (Id. at 158, 160.)  That MRI showed minimal joint effusion of the carpal area and intercarpal joint, primarily caused by osteoarthritis, and some irregularity of the articular cartilage of the distal right radius at the radial carpal area.  (Id. at 169.)  There was no definite ligament or tendon injury.  (Id.)  X-rays taken the same day showed minimal osteoarthritis but no fracture or dislocation.  (Id. at 171.)

On July 20, Plaintiff was again seen by Ms. Hahn-Brown.  (Id. at 161.)  Plaintiff reported that her wrist was "doing somewhat better" with the splint.  (Id.)  Her shoulder continued to hurt.  (Id.)  She had a good range of movement in the shoulder.  (Id.)  She had

---

[5]A Finkelstein test is used to diagnose de Quervain's tenosynovitis.  MayoClinic.com, De Quervain's tenosynovitis, http://mayoclinic.com/health/de-quervains-tenosynovitis/DS00692/DSECTION=6 (last visited January 11, 2007).  To perform the test, the thumb is bent across the palm of the hand, the fingers are bent down over the thumb, and the wrist is bent toward the little finger.  Id.  If the test causes pain on the thumb side of the wrist, it is considered positive.  Id.

a slightly positive Finkelstein test, but the drop arm test remained negative. (Id.) The MRI showed osteoarthritis in the right wrist and a slight irregularity of the articular cartilage in that wrist compared to the left. (Id.) Plaintiff wanted to focus the treatment on her shoulder; she was given an injection of Depo Medrol and Lidocaine and prescriptions for Feldene and Ultracet for pain. (Id.) She was to return in two weeks. (Id.)

Plaintiff reported at that follow-up visit that the injection had given her relief only for a few days. (Id. at 163.) The pain was worse when she lifted her shoulder or with certain movements. (Id.) The splint was of minimal help; the prescribed medications were of some help but did not completely resolve the pain. (Id.) On examination, she again had good range of movement in her shoulder, but was tender over the right acromioclavicular joint. (Id.) She was to have an MRI of her right shoulder to evaluate her right rotator cuff. (Id.) She was also to continue wearing the splint and taking the medication. (Id.) The next day, x-rays were taken of Plaintiff's right shoulder. (Id. at 166.) They were negative, revealing no fracture, dislocation, or abnormal separation of the acromioclavicular joint, or soft tissue calcification. (Id.) An MRI of her right shoulder was taken the same day. (Id. at 167-68.) It revealed minimal degenerative changes resulting in a minimal partial tear of the rotator cuff tendon, primarily due to osteoarthritis and degenerative changes, and tenosynovitis of the biceps tendon. (Id. at 167.) There was no evidence of a full tear of the rotator cuff tendon or bone bruise. (Id. at 168.)

Two weeks later, she was seen by a physician's assistant under the supervision of Dr. Ritter. (Id. at 164.) On examination, she had external rotation of her right shoulder to 80

degrees, internal rotation to 50 degrees with pain, and abduction to 120 to 130 degrees.  (Id.)

She had pain with resisted range of movement.  (Id.)  She had strengths at 4 or 4+ out of 5.

(Id.)  She had pain in her right wrist between the first and second dorsal compartments and

some swelling and tenderness.  (Id.)  She had a negative Finkelstein test.  (Id.)  The plan was

to have Plaintiff participate in therapy for her range of movement, strengthening, and

modalities in her right shoulder and wrist.  (Id.)  She received an injection of Depo Medrol,

Solu Cortef, and Lidocaine.  (Id.)

The ALJ also had before him the May 2004 Physical Residual Functional Capacity

Assessment ("PRFCA") of Plaintiff by a State agency consultant.  (Id. at 122-29.)  The listed

diagnoses were asthma, osteoarthritis in her right knee, and plantar fasciitis in her left heel.

(Id. at 122.)  These impairments resulted in exertional limitations of being able to occasionally

lift 20 pounds, frequently lift ten pounds, stand or walk for at least two hours in an eight-hour

workday, and sit about six hours in an eight-hour workday.  (Id. at 123.)  Plaintiff was

unlimited in her ability to push or pull.  (Id.)  She had no postural, manipulative, visual, or

communicative limitations.  (Id. at 124-26.)  She did have, however, one environmental

limitation.  (Id. at 126.)  Because of her asthma, she needed to avoid concentrated exposure

to fumes, odors, dusts, gases, and poor ventilation.  (Id.)

## The ALJ's Decision

Following the sequential evaluation process, described below, the ALJ first found that

Plaintiff had not engaged in substantial gainful activity after her alleged disability onset date

of December 1, 2003.[6]  (Id. at 15.)  At the second of the five steps, he found that her "ability

to do basic work activities ha[d] . . . been more than minimally limited by osteoarthritis of the

right shoulder and right wrist, right peroneal tendonitis and asthma."  (Id.)  These impairments

were severe.  (Id.)  Her right knee arthritis was not severe.  (Id.)  The severe impairments did

not meet or medically equal listing level severity, including Listing 1.02.[7]  (Id.)

The third step required a determination whether Plaintiff had the residual functional

capacity ("RFC") to return to her past relevant work or to perform any other work existing in

---

[6]The minimal amount of earnings Plaintiff had in 2001 and 2002 were insufficient to qualify
as substantial gainful activity.  See 20 C.F.R. § 404.1574(b) (2).  Consequently, the ALJ could also
have found that she did not engage in substantial gainful activity after the one alleged disability onset
date of January 5, 2001.

[7]Listing 1.02 is for a major joint dysfunction and reads, in relevant part, as follows:
Characterized by gross anatomical deformity . . . and chronic joint pain and stiffness
with signs of limitation of motion or other abnormal motion of the affected joint(s), and
findings on appropriate medically acceptable imaging of joint space narrowing, bony
destruction, or ankylosis of the affected joint(s).  With:

A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee,
or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

or

B.  Involvement of one major peripheral joint in each upper extremity (i.e.,
shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross
movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.02.

An "[i]nability to ambulate effectively means an extreme limitation of the ability to walk"
generally requiring the "use of a hand-held assistive device(s) that limits the functioning of both upper
extremities."  Id. at 1.00B2b (alteration added).  An "[i]nability to perform fine and gross movements
effectively means an extreme loss of function of both upper extremities."  Id. at 1.00B2c (alteration
added).  An example is an inability to prepare a simple meal and feed oneself.  Id.

significant numbers in the national economy.  (<u>Id.</u>)  This determination, in turn, required an evaluation of Plaintiff's credibility.  (<u>Id.</u>)  The ALJ found that the medical records, including MRIs, x-rays, and treatment notes, did not support her descriptions of disabling conditions.  (<u>Id.</u> at 16.)  Specifically, the notes indicated that she had a good range of motion in her right shoulder, good right upper extremity strength, a negative drop arm test, no more than a slightly positive Finkelstein's test, no upper extremity sensory abnormality, normal muscle strength in her right lower extremity, and a normal result on her most recent pulmonary function test.  (<u>Id.</u>)  She also had peroneal tendonitis that was effectively treated with an ankle brace and asthma that required physician intervention on only three occasions.  (<u>Id.</u>)

The ALJ noted that Plaintiff's testimony that she was unable to do any chores was inconsistent with her report to Dr. Ritter seven months earlier that she was able to do her daily activities.  (<u>Id.</u>)  And, there was no evidence of any deterioration in her condition during the relevant time period to explain this inconsistency.  (<u>Id.</u>)  She had been prescribed only a non-steriodal, anti-inflammatory drug for her musculoskeletal condition and, although she testified that she had numbness in her right hand, she consistently denied such to Dr. Ritter's office.  (<u>Id.</u> at 16-17.)  Her assertion that she had to use a nebulizer three or four times a day did not preclude work because she could use it before going to work and at lunch.  (<u>Id.</u> at 17.)  The ALJ further noted that the only change between the denial of her previous DIB application, see note 1, above, and the current applications was the issuance of the nebulizer.[8]  (<u>Id.</u>)

---

[8]The ALJ erroneously described the gap between the denial and the filing of the new applications as being less than one month – it was two months.  His observation about the lack of any

- 19 -

The ALJ next assessed Plaintiff's RFC as being the ability to lift, carry, push or pull ten pounds occasionally, sit six hours in an eight-hour day, and stand or walk a total of two hours in an eight-hour day. (Id.) She needed to avoid concentrated exposure to pulmonary irritants and temperature extremes. (Id.) This RFC constituted a wide range of sedentary work.[9] (Id.) Plaintiff's past relevant work as an office assistant was such work. (Id.) Moreover, it was performed indoors, eliminating any exposure to pulmonary irritants and temperature extremes. (Id.) The ALJ further noted that Plaintiff's last job as an office assistant had ended only because her family had relocated to Missouri. (Id.)

Accordingly, Plaintiff was not disabled within the meaning of the Act.

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B) (alterations added).

---

significant change between the two events remains accurate.

[9]Sedentary work requires lifting no more than 10 pounds at a time and occasional walking and standing. 20 C.F.R. § 404.1567(a).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520.  See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 404.1520(b).  Second, the claimant must have a severe impairment.  See 20 C.F.R. § 404.1520(c).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ."  Id. (alteration added).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work."  **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step in the process the ALJ must determine whether the claimant has the RFC to return to her past relevant work, "review[ing] [the claimant's] residual functional capacity and the physical and mental demands of the work [claimant has] done in the past."

20 C.F.R. § 404.1520(e) (alterations added).  "Past relevant work" is "[w]ork the claimant has already been able to do" and has been "done within the last 15 years, lasted long enough for him or her to learn to do it, and was substantial gainful activity."  20 C.F.R. § 220.130(a) (alteration added).  "[A]n ALJ must make explicit findings on the demands of the claimant's past relevant work."  **Zeiler v. Barnhart**, 384 F.3d 932, 936 (8th Cir. 2004) (alteration added).

"[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments."  **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added).  "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'"  **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).  Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence.  **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added).  Some medical evidence must be included in the record to support an ALJ's RFC holding.  **Id.** at 867.  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"  **Howard v. Massanari**, 255 F.3d 577, 581

(8th Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** <u>See</u> <u>also</u> **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. <u>See</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th

Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005); **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f). If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently."

**Strongson**, 361 F.3d at 1070.  Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [court] must affirm the agency's decision."  **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Plaintiff argues that the ALJ's decision erroneously (a) concluded she had the RFC to return to her past relevant work and (b) assessed her credibility.  The Commissioner disagrees.

As noted above, the determination of a claimant's RFC requires an assessment of her credibility.  Consequently, the undersigned will address Plaintiff's second argument first.  See **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005) (noting that "ALJ must first evaluate the claimant's credibility before determining a claimant's RFC").

"'Where adequately explained and supported, credibility findings are for the ALJ to make.'"  **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (quoting Lowe, 226 F.3d at 972).  When making those findings,"[t]he ALJ need not explicitly discuss each Polaski factor," but must acknowledge and consider those factors.  **Strongson**, 361 F.3d at 1072.  Accord **Lowe**, 226 F.3d at 972.  As noted above, the factors are:  (1) the claimant's daily activities; (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the dosage, effectiveness and side effects of any medication; and (5) the claimant's functional restrictions.  **Masterson v.**

**Barnhart**, 363 F.3d 731, 738 (8th Cir. 2004) (citing <u>Polaski</u>, 739 F.2d at 1322).  The lack of any supporting objective evidence is also a proper consideration.  **Id.**

In the instant case, the ALJ evaluated Plaintiff's credibility and discounted it based on several <u>Polaski</u> factors, including the lack of supporting objective evidence.  "Although 'an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary.'"  **Gonzales v. Barnhart**, 465 F.3d 890, 895 (8th Cir. 2006) (quoting <u>Ramirez</u>, 292 F.3d at 581) (alterations in original).  <u>Accord</u> **Baker v. Barnhart**, 457 F.3d 882, 892-93 (8th Cir. 2006); **Strongson**, 361 F.3d at 1072.  <u>See</u> <u>also</u> **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006) (affirming ALJ's negative assessment of claimant's credibility; claimant's "self-reported limitations" on daily activities were inconsistent with medical record).

Objective medical evidence undermined Plaintiff's allegations of disabling conditions.  Thirty-five days after she first sought medical attention for painful feet, Plaintiff reported that she no longer had any pain.  She did not again seek treatment for feet pain, specifically pain in her left heel, for 15 months, at least 14 months after her latest disability onset date.  An x-ray revealed no change in the interim.  Subsequent complaints of pain after Plaintiff had to be on her feet for any length of time were treated with advice to not wear inappropriate shoes and buy some good ones.

Six months before one alleged disability onset date and six months after another, she complained of worsening shortness of breath. A pulmonary functioning test was normal. One month later, she reported that her shortness of breath was becoming worse. Different medications were tried. Three months after Plaintiff was provided with a nebulizer, her asthma had improved. The next time Plaintiff consulted a doctor about her asthma was ten months later. She complained of an exacerbation of her asthma for the past two days. Air movement in her lungs improved after the first visit. After the second visit, she was told to follow-up as needed.

At the same time Plaintiff complained of worsening shortness of breath, sleep studies revealed sleep apnea and nocturnal myocolonus. These were treated with use of CPAP machine and medications.

While being treated for shortness of breath and sleep problems, Plaintiff consulted an orthopedist for right knee and wrist pain. X-rays revealed arthritis in her knee but no problem in her wrist. She had a good range of movement in her knee, but had pain on palpation. After a series of injections, her knee had improved and she had "excellent" motion in it.

Ten months after having last seen the doctor about her left heel pain, she consulted him about pain in her right ankle. She reported at this visit that her left heel no longer hurt. She had no decrease in muscle strength or arch height; there were no degenerative changes. The diagnosis of peroneal tendinitis was treated with an ankle brace and medication. Plaintiff reported some relieve with the brace; she forgot to take the medication. She was given a permanent brace and told to return as needed. There are no records of a return.

Similarly, Plaintiff was treated for right shoulder and wrist pain 19 months after her latest disability onset date. Objective tests, including x-rays, and physical examinations, including range of movement, showed minimal joint effusion and osteoarthritis. She was to participate in physical therapy and did receive some injections.

As the foregoing demonstrates, Plaintiff sought medical treatment for various complaints. Tests consistently failed to support the degree of pain and discomfort alleged by Plaintiff. Her complaints were linked to a diagnosis and treated. Sometimes, the treatment course went through some fluctuations. After the relevant treatment course was finished, Plaintiff reported improvement and did not return. See **Guilliams v. Barnhart**, 393 F.3d 798, 802 (8th Cir. 2005) ("Evidence of effective medication resulting in relief . . . may be inconsistent with claims of disabling pain.") (alteration added); **Rankin v. Apfel**, 195 F.3d 427, 429 (8th Cir. 1999) (finding that positive results of treatment undercut complaints of disabling pain); **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999) ("Impairments that are controllable or amenable to treatment do not support a finding of total disability."). The ALJ did not err in considering the lack of supporting objective medical evidence when evaluating Plaintiff's complaints. See, e.g. **Dukes**, 436 F.3d at 928 (finding that ALJ properly considered, inter alia, claimant's limited treatment of symptoms and his ability to control his various ailments through medication). This lack includes the absence of any restrictions placed on Plaintiff by any of her physicians. See **Brown v. Barnhart**, 390 F.3d 535, 541 (8th Cir. 2004) (affirming negative credibility decision by ALJ who noted, inter alia, that claimant's doctor had released her to work with no restrictions after one month).

The ALJ also did not err in considering the lack of any strong pain medication when evaluating Plaintiff's credibility.  See **Masterson**, 363 F.3d at 739; **Haynes v. Shalala**, 26 F.3d 812, 814 (8th Cir. 1994).

The ALJ cited Plaintiff's departure from her last job as an office assistant to relocate rather than for medically-related reasons in support of his adverse credibility findings. "Courts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition." **Goff v. Barnhart**, 421 F.3d 785, 793 (8th Cir. 2005) (holding that fact that claimant stopped working because she was fired for slapping patient was properly considered by ALJ as a detraction from her credibility and noting other Eighth Circuit case affirming ALJ's negative credibility assessment of claimant who lost job because position was eliminated and not because of disability); **Black v. Apfel**, 143 F.3d 383, 387 (8th Cir. 1998) (ALJ properly considered fact that claimant was laid off from position rather than forced out due to her impairments as a consideration weighing against her credibility).

Plaintiff argues that the ALJ erred when considering this fact as detracting from her credibility because she sought medical attention after she relocated to Missouri.  Plaintiff left her job as an office assistant in 1999, however, and did not seek medical attention until December 2002.  Additionally, her testimony that she left a job in November 2002 because of breathing problems is unavailing.  On her Work History Report, she lists her last job as ending in November 2000.  Her earnings record reports her total earnings in 2002 as $237.50, payable by a bowling alley in Missouri.  (R. at 72, 96.)  Plaintiff also argues that her good work history weighs in favor of her credibility.  This is correct.  See **Black**, 143 F.3d at 387.

The weight to be given this history can be offset, however, by her leaving work for a reason unrelated to her alleged impairments. See **Id.**

The inconsistency in when Plaintiff left work is but one inconsistency in the record. Another inconsistency, as the ALJ noted, was between her report to a doctor that she had been able to resume her daily activities and her testimony seven months later that she was unable to do any chores. Although Plaintiff correctly notes that a claimant need not be bedridden to be disabled under the Act, see **Baumgarten**, 75 F.3d at 369, the ALJ did not discount her credibility because she was bedridden but because she was inconsistent in her reports of what she could do. Moreover, regardless of whether Plaintiff's daily activities could be construed as supporting Plaintiff's claims, "[t]he ALJ was not obligated to accept all of [Plaintiff's] assertions concerning those limitations." **Ostronski v. Chater**, 94 F.3d 413, 418 (8th Cir. 1996) (alteration added).

Plaintiff was also inconsistent in her reports of when she became disabled, testifying she had to leave work in November 2002 because of breathing problems and listing a time 22 months earlier as one disability onset date and another time 13 months later as another disability onset date. She also reported that her impairments first bothered her in 1992; however, the medical records before the ALJ begin ten years later.

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, . . . but such assessments must be based on substantial evidence." **Id.** at 738 (alteration added). For the foregoing reasons, there is substantial evidence to support the ALJ's decision on Plaintiff's credibility.

Residual Functional Capacity. As noted above, "[i]t is the claimant's burden to establish her RFC at step four." **Masterson**, 363 F.3d at 737 (alteration added). In the instant case, Plaintiff's challenges to the ALJ's conclusions about her RFC fatally rely on her credibility. For instance, Plaintiff argues that it is difficult for her to move because of her asthma, cannot use a keyboard because of her arthritis, and cannot stand for any longer than 15 minutes. These restrictions are self-described limitations. Insofar as they appear in the medical records at all, it is in the context of her reporting them to her physicians.

Plaintiff was able to work as an office assistant with the functional limitations found by the ALJ. The ALJ also imposed environmental limitations on her RFC. The ALJ's finding that she has the RFC to return to this work is supported by substantial evidence on the record as a whole.

## Conclusion

The question is not how this court would decide whether Plaintiff is disabled within the meaning of the Act, but is whether the ALJ's decision that she is not is supported by substantial evidence in the record as a whole, including a consideration of the evidence that detracts from the ALJ's decision. For the reasons discussed above, there is such evidence. Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an

extension of time for good cause is obtained, and that failure to file timely objections may

result in waiver of the right to appeal questions of fact.  <u>See</u> **Griffini v. Mitchell**, 31 F.3d 690,

692 (8th Cir. 1994).


<u>/s/ Thomas C. Mummert, III</u>
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this <u>19th</u> day of January, 2007.